IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-cr-117-BO-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| STEVEN RANDALL BURCH | ) | |

This matter is before the Court on defendant's motions to dismiss indictment, to suppress statements, to sequester witnesses, and for disclosure and production of evidence. For the reasons discussed below, defendant's motions to suppress statements and motion for early disclosure of *Brady/Giglio* materials are granted. Defendant's motion to dismiss indictment is denied and defendant's motion to for disclosure of Rule 404(b) and motion to sequester witnesses are denied without prejudice.

## BACKGROUND

Defendant Steven Burch, a former businessman and investor, was determined to be disabled by the Social Security Administration (SSA) in 2010 and began receiving monthly Social Security Disability Insurance (SSDI) benefit payments in 2011. From 1993 to 1998, Mr. Burch had been the co-CEO of a medical consulting company, EnviroMed, that he started with a partner. In 2000, Mr. Burch moved into investment work, eventually working as Senior Vice President and Director of Investment Services for the State of Florida with BB&T, before starting his own small investment firm in 2007. Mr. Burch began experiencing health issues in 2001, when he was diagnosed with kidney cancer. Over the next decade, other health conditions manifested so that, by 2009, defendant was dealing not only with the cancer, but also with severe diabetes and sleep apnea. Mr. Burch underwent two operations, one in 2001 on his kidney and one in 2007 on his

lung, for cancer, as well as extensive radiation treatment. On June 3, 2020, he applied for Title II Disability Insurance Benefits (DIB). Since being declared disabled by the SSA on September 26, 2010, Mr. Burch's medical conditions have continued to worsen, and he currently requires a form of geriatric home care, despite being only fifty-eight years old.

Mr. Burch began dating a woman named Julia Carter following Mr. Burch's separation from his then-wife in 2011. In 2014, Ms. Carter decided to start a business named J.B. Fitz, Inc., which would sell insurance and retirement plans to businesses. The instant criminal action against Mr. Burch stems from his level of involvement in Ms. Carter's businesses. Mr. Burch maintains that he only served as an advisor to Ms. Carter's enterprises, doing things like advising her on how to set up the businesses, putting her in touch with some of his professional contacts, and operating as a sounding board for her. He maintains that his role, at most, takes a few hours each week. The government, on the other hand, proceeds on its indictment on the theory that Mr. Burch was fully immersed in the operations of the business and that he did this substantial work while representing to the SSA that he was unable to work. It is undisputed that Mr. Burch did not receive a salary for his work with J.B. Fitz.

On June 15, 2017, as part of the investigation into Mr. Burch, two agents from the North Carolina State Bureau of Investigation's (NCSBI) Cooperative Disabilities Investigative Unit (CDIU) went to Mr. Burch's home to conduct an undercover interview. In order to obtain his consent to enter the home and conduct the interview, the agents told Mr. Burch and Ms. Carter a fabricated story, saying that Mr. Burch's name was being forged by a fictitious third party to illegally obtain prescription drugs and that the agents were investigating the forgery. The agents even presented a fictitious photograph of a young man that they believed was the culprit. Trusting their representations, Mr. Burch and Ms. Carter invited the agents into their home, participated in

the interview, and shared details of their personal affairs, including Mr. Burch's professional activities and disability. During this visit, the agents recorded video footage, but they did not record audio.

Then, in early July 2017, Mr. Burch received a letter from the SSA telling him that the SSA had scheduled an appointment for him on July 25, 2017 to discuss his earnings. The letter directed him to bring his tax returns and bank statements. It provided no other information about the nature of the interview and did not mention retaining counsel. Mr. Burch went to the appointment, where he was greeted by one of the NCSBI agents who had come to his house a month earlier. He was taken to an interview room with a second NCSBI agent and a SSA technical expert. Burch asked, "am I in trouble?" The agents told him he was not in trouble, and they stated more than once that they were just "gathering information." Mr. Burch also asserts that when he asked whether he should call his lawyer, he was told that it was not necessary. The government disputes this assertion. Mr. Burch was not told that he was the target of a criminal investigation, and he was instead told that this was just an administrative interview regarding his benefits.

In early 2018, following the July 2017 interview with Mr. Burch and a corresponding interview with Ms. Carter, SSA notified Mr. Burch that his self-employment disqualified him for disability insurance. The SSA technical expert valued Mr. Burch's contribution to Ms. Carter's business at $200,000, which cleared the threshold for "substantial work activity," making him ineligible for benefits. Burch asked for reconsideration, upon which the SSA technical expert retracted his $200,000 valuation and instead attributed half of Ms. Carter's income beginning in July 2015 to him. Following denial of his appeal, Burch's benefits were stopped in June 2018. Less than a month later, the investigative unit forwarded Burch's case to the U.S. Attorney's Office.

3

In March 2020, the government charged Mr. Burch on three counts: (1) theft of government property, in violation of 18 U.S.C. § 641; (2) social security fraud, in violation of 42 U.S.C. § 408 (a)(4); and (3) making false statements in his continuing disability review report, in violation of 18 U.S.C. § 1001. On June 15, defendant filed six pre-trial motions. He moves to dismiss the indictment, to suppress the statements made during the June and July 2017 interviews and all evidence derived therefrom, to compel production of *Brady/Giglio* materials, to compel disclosure of Rule 404(b) evidence, and to sequester witnesses at trial. The government has responded to the motions, which are ripe for disposition.

## DISCUSSION

Motions to Suppress

    I.    Interview on June 15, 2017

The Court begins with defendant's motions to suppress the statements—and all evidence derived therefrom—from the June and July 2017 interview.

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (citation omitted). "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one jealously and carefully drawn exception, recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (internal quotations and citations omitted). To constitute a valid warrantless entry into the home based on consent, the government must prove that the consent was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citations omitted).

While some level of deception from law enforcement is permitted, such as with undercover agents, the government's deceitful tactics must not prevent the suspect from making a voluntary

4

choice. *See, e.g., Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). Voluntary consent is impossible when the government creates an inherently coercive interaction by misrepresenting the nature of its investigation—in particular, when the agent fabricates a need for urgent action and participation on the part of the suspect. *See Whalen v. McMullen*, 907 F.3d 1139, 1147 (9th Cir. 2018) (finding consent involuntary when a CDIU agent identified himself as a law enforcement agent and requested assistance in a fictitious investigation); *Pagán-González v. Moreno*, 919 F.3d 582, 597 (1st Cir. 2019) (finding consent involuntary when based on agents' representations that government computers in Washington, D.C. were receiving signals or viruses from a computer at defendant's location); *United States v. Parson*, 599 F. Supp. 2d 592, 603–05 (W.D. Pa. 2009) (finding consent involuntary when agents told suspect that he might have been an identity theft victim); *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) (finding consent involuntary when agent entered home under false pretense that he was a state licensing official).

Here, agents from the NCSBI showed up unannounced at Mr. Burch's door and told him that his name was being fraudulently used to procure prescription drugs unlawfully. Given the inherent data security and public safety implications of the government's ruse, Mr. Burch did what any reasonable person would do—he trusted the government's representations and attempted to assist them. Indeed, not doing so supposedly would have risked continued theft of his identity and proliferation of unlawful prescription drugs. The government cannot gain consent by preying on its citizens' trust and sense of duty to assist law enforcement. The government's conduct here was particularly repugnant, as the ruse targeted defendant in his own home. Mr. Burch's "consent" to the warrantless entrance of his home was not voluntary. The government's entrance into his home was therefore unreasonable and in violation of the Fourth Amendment. Defendant's motion to

5

suppress is granted. All statements made by Mr. Burch or Ms. Carter during the June 15, 2017 interview, and all evidence derived therefrom, are suppressed from evidence.

II. Interview of July 25, 2017

Defendant also moves to suppress the statements of the July 25 interview at SSA as violating his rights under the Fourth, Fifth, and Fourteenth Amendments.

The government may not proceed against the subject of civil or administrative investigation in bad faith, misleading the subject of the investigation into providing incriminating evidence for use in a criminal prosecution. *See United States v. Kordel*, 397 U.S. 1, 11–13 (1970); *United States v. Stringer*, 535 F.3d 929, 936–37 (9th Cir. 2008). "Bad faith involves fraud or deceit on the part of the government." *Groder v. United States*, 816 F.2d 139, 144 (4th Cir. 1987) (citations omitted). As an example, bad faith arises when an administrative agent misrepresents the potential for a criminal referral in order to obtain information from the target. *Id.* Courts of appeals have suggested that suppression of evidence is appropriate when the government makes affirmative misrepresentations in a civil or administrative action. *See, e.g., Stringer*, 535 F.3d at 940 (collecting cases).

Here, defendant's unrebutted assertions about the July 25 interview, when viewed in light of the previous June 15 house visit, demonstrate bad faith on the part of the government agents in this case. As previously discussed, on June 15, 2017, Special Agent Cecil Cherry and Criminal Specialist Scott Faircloth of the NCSBI carried out a ruse against defendant to get into his home and coerce him into making incriminating statements about his personal affairs. Then, with one week's warning, defendant was summoned to the SSA office for an interview. The only information provided in the letter was that it the interview was to "discuss your earnings posted on your Social Security record." DE 15-1. Upon arrival at the SSA, Burch asked, "Am I in trouble?

6

What is this?" The investigators replied that he was not in trouble and that they were just "gathering information." Burch contends that he asked whether he should call his lawyer, to which the investigators responded that it was not necessary. Burch also contends that he was the target of a criminal investigation at that point.

The government only contests defendant's assertions that the agents told him that a lawyer was not necessary and that he was the target of a pending criminal investigation. According to the government, because the case was not referred to the U.S. Attorney's Office until July 2018—which immediately followed the conclusion of the administrative proceedings—defendant was not the subject of a pending criminal investigation. However, the government cites no authority for the sweeping proposition that a criminal investigation does not begin, and law enforcement cannot proceed with bad faith, until a matter is formally referred to the U.S. Attorney's Office.

Instead, the facts indicate that the government acted in bad faith. the CDIU's "primary responsibility . . . is to investigate allegations of fraud in SSA's disability programs for purposes of criminal prosecution and/or civil/administrative action." *Whalen*, 907 F.3d at 1150. CDIU only investigates benefits applicants who have been flagged for suspected fraud, "and the investigations are done on the understanding that if fraud is discovered, there may be civil or criminal consequences." *Id.* at 1151. However, when defendant explicitly asked what the interview was for, instead of explaining the implications of the interview and informing defendant that he could be subject to civil or administrative action, much less criminal action, the government avoided telling defendant anything other than that they were "gathering information." Although the government was not actively pursuing defendant's criminal prosecution at the time of the interview, the agents that interviewed defendant were criminal investigators. The government's actions in this case violate the prohibition on the government deceiving individuals into providing information that

7

the government intends to use in a criminal investigation by cloaking their inquiry in a civil or administrative investigation. Defendant's motion to suppress is granted. All statements made by Mr. Burch during the July 25, 2017 interview, and all evidence derived therefrom, are suppressed from evidence.

Motion to Dismiss Indictment

Defendant has moved to dismiss the indictment in this case on the ground that the underlying issue of law in dispute is highly debatable and vague and therefore cannot support a criminal prosecution under the Due Process Clause of the U.S. Constitution. In this case, there is no dispute that Mr. Burch is medically disabled and that he was not working a job that paid him wages which he attempted to divert or hide. Instead, the government proceeds under a theory that Mr. Burch's assistance to Ms. Carter in her business constituted "substantial gainful activity" such that Mr. Burch became ineligible to receive Social Security disability benefits. Defendant argues that the Due Process Clause bars a criminal prosecution under that standard because it is so vague and debatable that no reasonable person in Mr. Burch' standard could be certain when its legal threshold was crossed.

"[N]o man shall be held criminally responsible for conduct that he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964). Congress must define criminal offenses with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "It is settled that when the law is vague or highly debatable, a defendant, actually or imputedly, lacks the requisite intent to violate it." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974). "Substantial gainful activity" is defined as "work activity" that is "both substantial and gainful." 20 CFR § 404.1572. "Substantial"

8

activity is "work activity that involves doing significant physical or mental activities," and "gainful" activity is "work usually done for pay or profit, whether or not a profit is realized. *Id.*

Mr. Burch was charged with violating three federal statutes, but his engagement in substantial activity was not part of any of those charges. The substantial gainful activity standard is only an underlying part of the charged fraud. The Fourth Circuit has rejected vagueness arguments premised upon terms found outside of the charging statute. *See, e.g., United States v. Janati*, 237 F. App'x 843, 846 (4th Cir. 2007) (unpublished) (rejecting argument in a healthcare fraud scheme case that a vagueness challenge could rest on ambiguities in a manual outside of the health care fraud statute defendant was charged under). The cases upon which defendant relies involved ambiguous language in the charged statute itself. *See United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985) (finding that the issue of the timing of the deduction was an issue that was vague or highly debatable when the case involved a complex tax regulation that was subject to multiple interpretations that were both reasonable and well-supported); *Critzer*, 498 F.2d 1160 (4th Cir. 1974) (finding a criminal tax provision vague when the ambiguous language was in the charged tax code itself).

Even if the substantial gainful activity standard could provide the basis for a vagueness challenge in this case, the statute charged in this case includes a specific intent to violate the law, which has the potential to defeat a vagueness challenge. *See United States v. Jaensch*, 665 F.3d 83, 90 (4th Cir. 2011) (collecting cases). The government will have to prove that Mr. Burch specifically intended to violate the charged statute, and this will protect Mr. Burch from any arbitrary and discriminatory enforcement. The jury should decide whether Mr. Burch was knowingly able to engage in substantial gainful activity.

9

Finally, defendant's argument that the "special rule" set out in 20 CFR §404.1575(e) applies does not defeat the indictment, either. There is no indication that the government violated the rule because the amended decision rendered by a SSA specialist was solely income-based. In the amended decision, half of Ms. Carter's income was applied to Mr. Burch because it constitutes earnings Mr. Burch would have received had he not concealed his work activity from the SSA. Therefore, the motion to dismiss the indictment must be denied.

Motion to Sequester Witnesses

Defendant moves this Court for an order sequestering all witnesses the government intends to call during trial and prohibiting the government's witnesses from discussing their testimony with other persons who will be called as witnesses at the trial. An order to sequester witnesses is typically granted at the start of a trial. Defendant should renew his motion to sequester before trial. Defendant's motion to sequester witnesses is therefore denied without prejudice to be refiled later.

Motion for Early Disclosure of *Brady/Giglio* Material

Defendant moves pursuant to Rule 16 of the Federal Rules of Criminal Procedure and the principles of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995) for an order requiring immediate disclosure of all *Brady/Giglio* material the government has in its possession. The government has not responded in opposition. For good cause shown, the Court grants this motion.

Motion for Disclosure of Rule 404(b) Evidence

Defendant requests that the government disclose the substance of any evidence it intends to introduce against defendant pursuant to Rule 404(b) of the Federal Rules of Evidence. The government filed a notice of intent to present Rule 404(b) evidence and stated that it does not seek

any formal response or action from the Court at this time. Therefore, this motion is denied without prejudice.

## CONCLUSION

For the foregoing reasons, defendant's motions to suppress statements [DE 15, 16] and motion for early disclosure of *Brady/Giglio* materials [DE 17] are granted. Defendant's motion to dismiss indictment [DE 14] is denied and defendant's motion to for disclosure of Rule 404(b) [DE 18] and motion to sequester witnesses [DE 19] are denied without prejudice.

SO ORDERED, this 25 day of February, 2021.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE